1  DANIEL L. WARSHAW (Bar No. 185365)
2      dwarshaw@pwfirm.com
   BOBBY POUYA (Bar No. 245527)
3      bpouya@pwfirm.com
4  NAVEED ABAIE (Bar No. 323338)
       nabaie@pwfirm.com
5  **PEARSON WARSHAW, LLP**
6  15165 Ventura Boulevard, Suite 400
   Sherman Oaks, California 91403
7  Telephone: (818) 788-8300
8  Facsimile:  (818) 788-8104

9  *Counsel for Plaintiff and the Proposed Classes*

10 *Additional Counsel Listed on Signature Page*

11

12

13                 **UNITED STATES DISTRICT COURT**

14     **CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

15

16 MINNESOTA INDEPENDENT          | CASE NO. 2:24-cv-10297
17 PHARMACISTS, individually and on
   behalf of a class of those similarly   **CLASS ACTION**
18 situated,
                                   **CLASS ACTION COMPLAINT**
19             Plaintiff,

20        v.

21 GOODRX, INC.; GOODRX
22 HOLDINGS, INC.; CVS CAREMARK
   CORP.; EXPRESS SCRIPTS, INC.;
23 MEDIMPACT HEALTHCARE
24 SYSTEMS, INC.; and NAVITUS
   HEALTH SOLUTIONS, LLC,
25
              Defendants.
26

27

28

1024833.1

CLASS ACTION COMPLAINT

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

# I. <u>INTRODUCTION</u>

1. Plaintiff Minnesota Independent Pharmacists ("MNindys" or "Plaintiff") brings this antitrust class action to put a stop to Defendants' illegal price-fixing scheme, which targets independent pharmacies like Plaintiff's members. Defendants—a generic-drug coupon provider (GoodRx) and four leading pharmacy benefit managers, or PBMs (Caremark, Express Scripts, MedImpact, and Navitus (collectively "PBM Defendants")—are ostensibly competitors for pharmacy reimbursements when patients fill prescriptions for generic medications. But rather than compete, GoodRx and the PBM Defendants agreed to artificially suppress prescription drug reimbursement rates paid to independent pharmacies, and to increase fees charged to pharmacies, on all GoodRx-related transactions. This conspiracy has caused harm to independent pharmacies throughout the United States.

2. PBMs contract with health plan sponsors to administer prescription benefit services. A PBM creates a network of pharmacies where plan members can fill prescriptions under their insurance benefits. For pharmacies (especially local, independent pharmacies), being "in network" with large PBMs, such as the PBM Defendants, is a matter of survival. These PBMs—among the largest PBMs in the country—control pharmacies' access to patients: if a pharmacy is not in a PBM's network, it cannot obtain reimbursement from health plans associated with the PBM, and those insurers' members will not patronize that pharmacy. Nationwide, close to two-thirds of all prescriptions filled in the United States are processed through one of these four PBMs. In some areas of the country, that number is as high as 97%. Losing access to patients affiliated with one or more PBMs could cost an independent pharmacy its business.

3. PBMs use this as leverage to underpay pharmacies. PBMs force independent pharmacies to accept unreasonably low reimbursement rates—leaving pharmacies with, on average, a margin of just $0.03 per pill dispensed, and often reimbursements that are *less* than a pharmacy's acquisition costs. As a result of this

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    dynamic, local independent pharmacies across the U.S. are struggling to survive.

2    Once a staple of every community, today there are only about 20,000 independent

3    pharmacies left, and over a third of them are at imminent risk of insolvency. This

4    benefits the PBMs, while harming the patients and communities the independent

5    pharmacies serve. When independent pharmacies go out of business, patients lose

6    access to healthcare and there is less competition in the pharmacy industry, which

7    increases prescription prices.

8         4.    GoodRx, Inc. was designed to profit from the broken system the PBMs

9    created. GoodRx aggregates generic drug prices from multiple PBMs and uses an

10   algorithm to show patients the lowest available price for their specific prescription at

11   local pharmacies. The patient can present a GoodRx discount code at the pharmacy

12   counter to take advantage of GoodRx's prices. In exchange for an annual or monthly

13   subscription fee, GoodRx allows patients to access further discounts at select

14   pharmacies.

15        5.    Since its inception in 2011, GoodRx has been a horizontal competitor

16   with PBMs for prescription drug reimbursements, even as it benefited from prices

17   those PBMs set. Each time a patient approached a pharmacy counter, they had a

18   choice: they could *either* use their prescription drug benefit *or* they could use

19   GoodRx. Not both.

20        6.    In 2024 GoodRx and the PBM Defendants agreed to implement an

21   "Integrated Savings Program" whereby Good RX agreed with the PBM Defendants

22   to handle prescription reimbursements jointly. GoodRx integrated its algorithm and

23   real-time pricing information from various PBM competitors directly into

24   Caremark's, Express Scripts', MedImpact's, and Navitus's prescription

25   reimbursement infrastructure.

26        7.    Now, each time a pharmacy sends a prescription drug reimbursement

27   request to one of the PBM Defendants, the PBM Defendant algorithmically checks its

28   own negotiated prescription drug price against those of its competitors (which are

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

3

1  aggregated by GoodRx) and selects the lowest available rate at which to reimburse
2  the pharmacy. The pharmacy's reimbursement rate is therefore set and determined by
3  the GoodRx algorithm using real-time data.

4      8.    As a result of this Integrated Savings Program scheme, Defendants
5  artificially suppress the rate at which they reimburse pharmacies, and they increase
6  the fees pharmacies must pay. They have implemented this conspiracy by sharing
7  their own, and accessing their competitors', reimbursement information, using real-
8  time, non-public, confidential, and proprietary generic-drug pricing information
9  through an algorithm. And they profit handsomely: GoodRx has been able to increase
10  the number of prescriptions on which it collects fees by 5% since starting this scheme,
11  and the PBM Defendants have collected fees on additional prescriptions and grown
12  their revenues considerably by paying less than their negotiated reimbursement rates
13  for adjudicating prescription drug claims.

14      9.    Defendants' collusive agreement to fix the price of pharmacy
15  reimbursements for generic medicine is *per se* illegal under the federal antitrust laws.
16  Defendants may not accomplish this forbidden price-fixing activity by passing their
17  pricing information through an algorithm—*especially* not an algorithm maintained
18  and operated by a horizontal competitor.

19      10.   GoodRx and the PBM Defendants' scheme has injured Class Members,
20  including local independent pharmacies, by tens, if not hundreds, of millions of
21  dollars in under a year. Defendants' illegal conspiracy to underpay pharmacies must
22  be stopped.

23                          **II.  <u>PARTIES</u>**

24      11.   Plaintiff Minnesota Independent Pharmacists is a Minnesota 501(c)(4)
25  nonprofit organization that educates patients, employers, unions, and legislators on
26  PBM practices and issues in Minnesota. MNindys began in June 2020 and formalized
27  in 2024. MNindys' membership has grown to 108 member pharmacists representing
28  165 stores in the state, who are dedicated to supporting Minnesota's independent

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

pharmacies by bringing awareness to the problems local pharmacies and their patients face due to PBM anticompetitive business practices, and to seeing both meaningful legislation and actionable enforcement regarding PBMs take place in Minnesota. MNindys and its members are go-to resources for state legislators when it comes to education on what is really happening behind the PBM iron curtain.

12.     Defendant GoodRx, Inc. is a Delaware corporation with its principal place of business located at 2701 Olympic Boulevard, West Building Suite 200, Santa Monica, California, 90404. It is a wholly owned subsidiary of GoodRx Intermediate Holdings, LLC, which in turn is a wholly owned subsidiary of GoodRx Holdings, Inc. GoodRx processes 2.5% of all prescription drug claims in the United States.

13.     Defendant GoodRx Holdings, Inc., is a Delaware corporation with its principal place of business located at 2701 Olympic Boulevard, West Building Suite 200, Santa Monica, California, 90404.

14.     Defendants GoodRx Inc. and GoodRx Holdings, Inc., are collectively referred to in this complaint as "GoodRx."

15.     Defendant CVS Caremark Corporation ("Caremark") is a Delaware corporation with its principal place of business located at One CVS Drive, Woonsocket, Rhode Island, 02895. It is a wholly owned subsidiary of CVS Health Corporation, a Delaware corporation with its principal place of business located at the same address. In 2023, Caremark processed 34% of all prescription drug claims in the United States. It manages prescription benefits accessed by more than 100 million Americans, representing nearly one third of all lives covered by insurance ("covered lives"), and 30% of the entire U.S. population.

16.     Defendant Express Scripts, Inc. ("Express Scripts"), is a Delaware corporation with its principal place of business located at One Express Way, Saint Louis, Missouri, 63121. It is a wholly owned subsidiary of Express Scripts Holding Company, also a Delaware corporation with its principal place of business at the same address. Express Scripts Holding Company is itself a wholly owned subsidiary of The

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Cigna Group, a Delaware Corporation with its principal place of business located at 900 Cottage Grove Road, Bloomfield, Connecticut, 06002. Express Scripts commands a 23% market share in the market for prescription drug claim reimbursements, measured by the total equivalent prescription claims managed in 2023.

17.    Defendant MedImpact Healthcare Systems, Inc. ("MedImpact"), is a privately held California corporation with its principal place of business located at 10181 Scripts Gateway Court, San Diego, California, 92131. MedImpact commands a 5% market share in the prescription drug claim reimbursement market, measured by the total equivalent prescription claims managed in 2023. And it covers more than 55 million patients, or more than 18% of covered lives.

18.    Defendant Navitus Health Solutions, LLC ("Navitus") is a privately held Wisconsin corporation with its principal place of business at 361 Integrity Drive, Madison, Wisconsin, 53717. It is jointly owned by SSM Health Care Corporation, a non-profit headquartered in Saint Louis, Missouri, and Costco Wholesale Corporation, a Washington corporation with its principal place of business located at 999 Lake Drive, Issaquah, Washington, 98027. Navitus manages the prescription benefits of approximately 7 million Americans, representing approximately 2.3% of covered lives.

19.    The PBM Defendants collectively process close to two-thirds of prescription claims processed in the United States each year, and they control pharmacies' access to more than 87% of patients with insurance.

## III.  **JURISDICTION AND VENUE**

20.    This action arises under section 1 of the Sherman Act, 15 U.S.C. § 2, and section 4 of the Clayton Act, 15 U.S.C. § 15(a). The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331(a) and (d), 1337(1), and 15 U.S.C. § 15.

/ / /

/ / /

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    21.    Venue is appropriate within this district under 15 U.S.C. §§ 15(a), 22,

2    (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b), (c), and (d) (general

3    venue provisions).

4    22.    Defendants transact business within this district, transact their affairs and

5    carry out interstate trade and commerce in substantial part within this district, and/or

6    their agents may be found in this district.

7    23.    Defendants' conduct was within the flow of, was intended to, and did

8    have a substantial effect on, interstate commerce of the United States, including in

9    this district.

10    24.    During   the   class   period,   Defendants   offered   and   processed

11    reimbursements for prescription drug claims in an uninterrupted flow of interstate

12    commerce.

13    25.    During the class period, Defendants or one or more of their affiliates used

14    the instrumentalities of interstate commerce in furtherance of the conspiracy alleged

15    herein. The conspiracy in which Defendants engaged had a direct, substantial, and

16    reasonably foreseeable effect on interstate commerce.

17    26.    This Court has personal jurisdiction over Defendants. All Defendants

18    have transacted business, maintained substantial contacts with, and/or committed

19    overt acts in furtherance of the illegal conspiracy throughout the United States,

20    including within this district. The conspiracy was aimed at, and had the intended effect

21    of, causing injury to persons and entities residing in, located in, or doing business

22    within the United States, including in this district.

23    ## IV.  **INDUSTRY BACKGROUND**

24    27.    The prescription drug distribution chain is a complicated, multifaceted

25    web of players: Pharmaceutical companies make and sell prescription drugs. Doctors

26    prescribe drugs. Pharmacies dispense the drugs. Plan sponsors (often employers) offer

27    health plans to their patient-members that help pay for those drugs. Insurers help pay

28

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  for a portion of the cost of the drugs. And patients are prescribed and consume the
2  drugs. But at the center of this web are unseen middlemen: the PBMs.

3      28.    GoodRx also sits in the middle of this space through a drug discount
4  program. Although GoodRx emerged as a competitor positioned to try to disrupt the
5  PBM industry, instead, it has colluded with the PBMs to enrich both itself and the
6  PBM Defendants, at the expense of independent pharmacies and the communities
7  they serve.

8  **A.    PBMs are Powerful Middlemen who are Responsible for Pricing**
9  **Prescriptions to Patients and Independent Pharmacies.**

10      29.    When PBMs first emerged more than 50 years ago, they served
11  predominantly as claims processors, to help pharmacists process the transactions
12  necessitated when a patient fills a prescription. In fact, the first PBMs were founded
13  by pharmacists to help pharmacists.

14      30.    In their modern form, though, these PBMs have morphed into behemoth
15  middlemen: they can manipulate, and profit from, almost every step in the
16  prescription drug supply chain. Senator Ron Wyden has called PBMs "one of the most
17  confounding, gnarled riddles in American health care today," noting:

18          Pharmacy benefit managers are among the most profitable
19          companies in America. What these pharmacy benefit
20          managers actually do to rake in all of these profits [is] a
21          mystery . . . . [W]hether pharmacy benefit managers bring
22          any real value to [patients] is a mystery.[1]

23      31.    PBMs limit patients' medication choices and force patients to shoulder
24  additional costs. Rather than process all prescription transactions, they decide which

25
26

27  _____

[1] U.S. Senate Committee on Finance Hr'g, *Drug Pricing in America: A Prescription*
28  *for Change, Part III* at 2–3 (Apr. 9, 2019).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

medications a patient can access through their insurance.[2] For some expensive drugs, PBMs impose onerous barriers to patients trying to access a prescribed drug, such as requiring prior authorization, imposing step therapy requirements, or setting supply limits.

32.    Today, most of the largest PBMs are parts of vertically integrated conglomerates encompassing almost all facets of the prescription drug supply chain.[3] All major PBMs share one common trait: they are vertically integrated with in-house mail-order, specialty, and (sometimes) brick-and-mortar pharmacies that compete directly with local independent pharmacies. This vertical integration, coupled with their power within the drug supply chain, gives PBMs both the motive and the means to harm local community pharmacies to help their own affiliated pharmacies.

33.    The pathway to payment for pharmacies is complex and involves multiple entities within the pharmaceutical drug distribution chain. But the overall economics of an independent pharmacy are quite simple: to remain in business, an independent pharmacy must make more money than it spends.

34.    PBMs play a central role in determining how independent pharmacies get paid for dispensing prescriptions to insured patients. For prescriptions, when an

---

[2] Internal PBM documents recently unearthed by the Federal Trade Commission ("FTC") show that PBMs "make formulary determinations to maximize profits" for themselves and their integrated insurers. That is, they replace scientific and medical judgement with their self-interested business judgment. FTC Interim Staff Report at 10.

[3] Take Caremark, for example. It is owned by CVS Health. CVS Health also owns Aetna, CVS chain retail pharmacies ubiquitous across the United States, a specialty pharmacy called CVS Specialty, and a number of healthcare providers, including CVS's Minute Clinics, Oak Street Health, and Signify Health. Or Express Scripts: it is owned by the Cigna Group, which also owns insurer Cigna Healthcare, two specialty pharmacies, and several healthcare providers. Some PBMs are consolidated through other structures. For example, Navitus is owned, in part, by wholesale giant Costco, which operates pharmacies in many of its stores.

independent pharmacy dispenses a prescription, it inputs into a database the patient's insurance information along with the details of the prescription dispensed; the database returns information about the reimbursement rate for the drug and the patient's payment obligations, such as a copay or co-insurance representing a portion of the cost of the drug. The pharmacy then bills the patient's PBM for the remainder. The PBM then reimburses the pharmacy at a contracted rate for the prescription and bills the patient's health plan sponsor (an insurer or the patient's employer) for handling the transaction at a rate agreed to between the PBM and the plan sponsor.

35.    PBMs determine what pharmacies insureds can use. Belonging to a PBM's pharmacy network is critical to a pharmacy's survival, especially with respect to the largest PBMs because they control such a large share of the market: the three largest PBMs control 80% of covered lives nationally (Caremark and Express Scripts, two of the biggest three, collectively control access to 66% of covered lives). And, depending on the location of a pharmacy, a single PBM could account for nearly all covered lives.[4] If a pharmacy is not within a PBM's network, patients insured by health plans contracted with that PBM cannot use their prescription benefit at that store. Being out-of-network with, and thus unable to bill, even one PBM could render a small independent pharmacy financially unviable.

36.    PBMs exploit this power that they have over pharmacies in several ways. *First*, they dictate the terms on which pharmacies are reimbursed for serving insureds. PBMs' control over pharmacy networks gives the entities tremendous contracting power. The contracts between PBMs and independent pharmacies are complex, opaque, and ever-changing, and their terms disadvantage independent pharmacies. These terms are not negotiated. Leading PBMs offer independent pharmacies lopsided, unilateral, take-it-or-leave-it contracts. Many of them maintain a "no

---

[4] For example, in Vermont, Express Scripts controls access to 71% of lives; and the pairing of Express Scripts and Caremark control 97% of covered lives.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

redlining" policy, preventing independent pharmacies (but not large chain stores) from negotiating more reasonable terms. Pushing back on those terms could cost a local independent pharmacy its place in the PBM's network.

37.     *Second*, PBMs underpay independent pharmacies. Even though they are the ones providing prescription dispensing services, independent pharmacies get no say in how they are compensated for dispensing prescriptions. One study found that, as the amount that PBMs made on the prescription drug aripiprazole rose precipitously, pharmacies' margins fell from $3.89 to just $0.21. When all generic drugs are analyzed, pharmacies' average margins were just $0.03 cents per pill dispensed; and for many drugs, pharmacies' margins averaged a mere $0.007. Many times, PBMs reimburse independent pharmacies less than it costs the pharmacy to dispense a prescription. PBMs use arbitrary pricing formulas to underpay independent pharmacists. They refuse to commit in their network contracts to any ascertainable or predictable reimbursement rate for generic drugs.

38.     *Third*, PBMs charge independent pharmacies retroactive fees to further reduce independent pharmacies' survival odds. For prescriptions filled by Medicare or Medicaid beneficiaries, PBMs extract Direct and Indirect Remuneration, or "DIR," fees—non-transparent fees ostensibly tied to a pharmacy's performance on metrics like patient medication adherence or patient outcomes. Total DIR fees collected from pharmacies have ballooned 3400% from $500 million in 2014 to $17.1 billion in 2022.[5] For commercially insured beneficiaries, PBMs extract money from pharmacies in other ways: a common tactic is a "clawback." A clawback occurs when a PBM tells

---

[5] These fees harm patients too. PBMs will often negotiate a higher price with Medicare Part D plan sponsors, in exchange for higher DIR fees. As the Center for Medicare Studies has noted, when PBMs do, they "shift costs from the part D plan sponsor to beneficiaries [i.e., patients] who utilize drugs in the form of higher cost-sharing . . . ." Nat'l Community Pharm. Ass'n, *2023 NCPA Digest* at 332. And PBMs' regularly collect more DIR fees than they report, which translates into profits for them and for their plan-sponsor clients, but not into reduced premiums for patients. *Id.*

1 a pharmacy to collect a copay significantly higher than the actual value of the drug
2 (which it keeps secret), only to later claw that money back from the pharmacy. In one
3 example, a PBM instructed the pharmacist to collect a $50.00 copay from the patient,
4 but clawed back most of that payment, leaving the pharmacy with just $11.65. Even
5 though the PBM paid nothing at all towards the cost of the drug, it pocketed the
6 remaining $38.35.

7      39.    The money PBMs take from pharmacies is staggering. A recent study by
8 Nephron Research showed that PBM profits from fees collected by PBMs have
9 increased by more than 300% in the last decade. Today, 42 cents of every dollar spent
10 on prescription drugs is diverted to PBMs. This represents trillions in revenues in the
11 PBM industry every year.

12 **B.**    **GoodRx is a Horizontal Competitor of the PBM Defendants.**

13      40.    GoodRx operates a drug discount program. Drug discount cards have
14 been a feature of the prescription drug benefit landscape for more than a decade. They
15 profit from incentivizing patients to bypass their own insurance plans, and instead use
16 a discount card to minimize their out-of-pocket obligations for their prescription drug
17 needs.

18      41.    Discount cards can be specific to a particular drug manufacturer[6] or to a
19 designated pharmacy.[7] Or a discount program, like GoodRx's, can aggregate
20 information from several sources to advertise the lowest discounted price available
21 across multiple programs. Each one serves the same purpose: to offer patients a lower-
22 out-of-pocket cost for expensive prescription drugs.

---

[6] These discount cards are commonly specific to certain brand-name drugs and are intended to be used in conjunction with a patient's insurance.

[7] These are traditionally reserved to large pharmacies, not smaller independent pharmacies like Plaintiff's members and Class Members (such as Kroger's Rx Savings Club, discussed below).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

42.     Most prescription discount cards are available to patients at no cost and are conveniently available over the Internet. When a patient decides to use a discount card, they need only present it to a participating pharmacy, just as they would otherwise present an insurance card. The discount available through the discount card is usually backed by a PBM (the supplying PBM)—which is not always the PBM that administers the patient's pharmacy benefit (the patient's PBM). When the discount, offered through the discount card, is used to fill a prescription, the prescription is processed through the supplying PBM. The price charged to the patient at the pharmacy reflects not only the cost of the prescription, but also the fees the pharmacy must pay to the supplying PBM, a portion of which the supplying PBM passes on to the discount card program as payment for connecting the patient to the PBM.

43.     Discount cards ordinarily must be used instead of, not in addition to, a patient's insured prescription benefit. As a result, the medication costs offered by drug discount cards do not count towards satisfying a patient's insurance deductible or out-of-pocket maximums. When a patient uses a discount card, they are bypassing their insurance, and as a result are bypassing and decreasing the revenues for the patient's PBM.

44.     While there are several discount card programs available, GoodRx is the largest. It accounts for 44% of discount-card-facilitated transactions—more than triple the transactions facilitated by its next largest competitor.

**1.      GoodRx Originally Served Primarily Uninsured or Underinsured Patients Who Would Otherwise Pay Skyrocketing List Prices for Prescriptions.**

45.     GoodRx, Inc. was initially formed in 2011, and its ultimate parent company, GoodRx Holdings, Inc., was incorporated in September 2015. GoodRx went public in September 2020.

46.     GoodRx offers multiple different services, including telehealth services for patients and direct-to-consumer advertising opportunities for brand-name drug

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   companies. Its original offering and principal source of revenue is its discount card

2   program, which it calls its "prescription pricing service." Prescription pricing services

3   have accounted for 72% to 97% of GoodRx's revenue over the last six years.

4       47.    GoodRx's discount card program gathers drug pricing offers from a

5   number of sources, including the PBM Defendants and other PBMs. When a PBM

6   contracts with a pharmacy to establish a reimbursement rate for a prescription drug

7   for members of the insurance plans it serves, it typically also negotiates a "consumer

8   direct" or "cash network" price that can be accessed by patients who purchase

9   prescriptions without using insurance. PBMs usually do not publish these prices, so

10  they can be difficult for patients to find.

11      48.    GoodRx aggregates these patient-direct prices for generic drugs from

12  multiple PBMs and publishes them on its platform, which is accessible to patients

13  through its website and smartphone app. These published prescription drug prices are

14  refreshed on GoodRx's platform at nearly real time.

15      49.    When a patient accesses the GoodRx platform to search for the cost of

16  their specific prescription in their local area, GoodRx displays the prices offered at

17  specific local pharmacies. For example, if in May 2024, a patient in Fresno,

18  California, searched for available discounts on atorvastatin (generic Lipitor), GoodRx

19  would present a range of prices at 8 nearby pharmacies ranging from $10.85 at Vons

20  Pharmacy to $22.72 at CVS or Target for a 30-day supply of the drug. This represents

21  a savings from the manufacturers' list price of $128.

22      50.    GoodRx also offers a subscription service, called GoodRx Gold. In

23  exchange for an annual or monthly subscription fee, patients can access further

24  discounts at select pharmacies. For example, a 30-day supply of atorvastatin would

25  cost a GoodRx Gold member in Fresno between $7.05 at Vons Pharmacy and $13.55

26  at CVS or Target.

27      51.    GoodRx did not negotiate these prices itself. Instead, GoodRx's

28  published generic drug prices are a function of its contractual and non-contractual

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS,, CALIFORNIA 91403

14

relationships with PBMs. Participating PBMs agree to allow GoodRx to publish the cash network prices they have negotiated with specific pharmacies. As a condition of entering network contracts with PBMs, participating pharmacies must agree to accept GoodRx coupons from cash-paying customers.

52. Historically, a patient who chooses to use GoodRx would do so by showing a GoodRx coupon to the pharmacist. That coupon provides the key information about the supplying PBM that has negotiated the offered rate with the pharmacy, including the BIN (or Bank Identification Number) and PCN (Processor Control Number) code. From the BIN and PCN, the pharmacy can identify which PBM it should transact with. When the patient presents that discount code at a participating pharmacy, the pharmacist inputs the code instead of the patient's insurance information, the supplying PBM processes the transaction, and the pharmacist charges the patient the supplying PBM's price published by GoodRx.

53. Typically, in a prescription transaction processed by a patient with insurance, the insurer is the primary payor, responsible for the bulk of the prescription's cost. Transactions through GoodRx, by contrast, effectively make the patient the payor. But they are not considered cash-pay transactions because they are adjudicated by the supplying PBM. The supplying PBM collects from the pharmacy a fee that represents not only compensation for the pharmacy, but also GoodRx's compensation from the PBM for facilitating the transaction. This dynamic is mapped out in the right half of the following chart:

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403



54.    GoodRx's average fee for each prescription processed through its platform is approximately 15% of a patient's total retail cost, which typically hovers around $5.

### 2.    GoodRx Became a Useful Tool for Insured Patients and Competed for Generic Prescriptions With the PBM Defendants.

55.    Due to the savings it provides, GoodRx is increasingly used by insured patients as well. In 2020, when GoodRx went public, 36% of patients who used GoodRx had commercial insurance, 38% were Medicare or Medicaid beneficiaries, and 26% were uninsured. Today, 60% of GoodRx users have commercial insurance, 31% are Medicare or Medicaid beneficiaries, and only 9% are uninsured.

56.    This is thanks, in no small part, to PBMs shifting ever more of the cost of medications onto patients.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

57.   When GoodRx entered the market as a standalone drug discount card program, GoodRx and PBMs competed for patients to choose their service at the pharmacy counter. When a commercially insured patient approached the pharmacy counter: (1) they could process their prescription through their insurance, using their PBM's pharmacy benefit; or (2) they could opt to use GoodRx's discount card. If the patient used their insurance, GoodRx could not profit from the transaction; if the patient chose to use GoodRx because GoodRx offered a lower price, then the patients' PBM would not profit from the transaction.

58.   GoodRx itself acknowledges that it competes with the PBM Defendants, even though it often calls them "partners." GoodRx has stated that it competes with companies that provide savings off of list price on prescription drugs. This includes the PBM Defendants, because, as GoodRx has admitted to investors, "nearly all PBMs also have consumer direct or cash network pricing that they negotiated with pharmacies for patients who choose to purchase prescriptions outside of insurance." If those PBMs opted to directly distribute their own pricing information and offer more accessible discounted prices to patients, that could decrease demand for GoodRx's services.

59.   Likewise, the PBM Defendants acknowledge that they compete with GoodRx. Express Scripts, for example, acknowledges that one of the "primary competitive factors" affecting it business is its "provider networks"—including pharmacy networks—and, more specifically, "the ability to[] negotiate with retail pharmacies." Caremark, too, acknowledges that the "primary competitive factors" it contends with include its "ability to . . . negotiate favorable discounts from, and access to, retail pharmacy networks." Indeed, Caremark acknowledged that "[c]ompetitive pressures in the retail pharmacy industry are increasing," including pressures from "the growth of discount card programs." Navitus claims it gains a competitive edge by negotiating "improved pharmacy network rates," particularly with respect to

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  generic drugs. And MedImpact attempts to distinguish its pharmacy benefit services
2  by boasting about the breadth of its network.

3  **V.  THE GOODRX INTEGRATED SAVINGS PROGRAM CARTEL**

4  **A.    Rather Than Compete With GoodRx, The PBM Defendants Decided**
5  **to Collude With It.**

6       60.    GoodRx's service—providing a discount card to patients who cannot, or
7  choose not to, use their insurance benefit to cover the high cost of drugs—has been
8  wildly successful. By the time the company went public in 2020, its annual revenue
9  (from 2019) had already reached $388 million, with $66 million of that being net
10 income. And its profitability only grew from there: in 2020, it reported $550.7 million
11 in revenue; and in 2021, it reported $745.4 million; and in 2022 it reported $766.6
12 million. But in the middle of 2022, GoodRx hit a stumbling block: one of its key
13 partnerships dried up, leaving it to report a lower revenue for the first time. At the
14 same time, PBMs began feeling increasing competitive pressure—especially from
15 discount card programs. From these dynamics, an idea was born: GoodRx and the
16 PBM Defendants decided to stop competing, and instead began colluding to depress
17 and fix prices.

18      **1.    In 2022, GoodRx's Business Model Was Threatened**
19           **When Kroger Grocery Stores Ended an Existing**
20           **Discount Partnership With GoodRx.**

21      61.    For many years, GoodRx benefited from a discount card program jointly
22 operated by GoodRx and The Kroger Company ("Kroger"). Called the "Kroger Rx
23 Savings Club," the program brought in considerable revenue to GoodRx—about $150
24 million per year.

25      62.    That stopped when Kroger announced in early 2022 that it would end the
26 program and no longer accept GoodRx discounts at the pharmacy counter. As
27 GoodRx acknowledged to investors in the spring of 2022:
28 / / /

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1      Recently, we recognized a grocery chain sustained actions
2  that impacted acceptance of discounts from most PBMs for
3  a subset of drugs.

4      This impacted the acceptance of many PBM discounts for
5  certain drugs at the grocery stores, which affected many
6  parties, including GoodRx. As many of the discounts on
7  GoodRx are provided by PBMs, this issue directly impacted
8  our customers . . . . In April [2022], this dynamic
9  intensified, impacting more drugs and more of the groceries
10 and pharmacies, leading to significant lost volumes and an
11 expected greater impact on our Q2 and full year prescription
12 transactions revenue.

13     63.    Even though Kroger had comprised less than 5% of pharmacies that
14 accepted GoodRx cards and accounted for less than 3% of total U.S. prescription
15 revenues, the program accounted for almost one quarter of GoodRx's prescription
16 transaction revenue.

17     64.    Kroger's discount program has been phased out; it formally ended on
18 July 1, 2024.

19 **2.    In 2023, GoodRx Found a Solution: It Partnered With**
20 **the PBM Defendants to Collect Fees on Prescriptions**
21 **Processed Through Insurance, Not Just Cash Pay.**

22     65.    After Kroger announced the termination of its partnership with GoodRx,
23 GoodRx's stock, which had opened at $33 per share less than two years earlier,
24 plummeted to under $7 a share. For the next year, GoodRx's stock price hovered
25 between $4.11 and $8.11.

26     66.    In 2023, GoodRx reported $750.3 million in revenue—a $16 million
27 drop from the year before. To maintain value for investors, GoodRx needed a solution
28 that could rake in a large volume of prescription claims in a market where it already

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

19

accounted for nearly half of all discount-card transactions in a field with many competitors.

67.    In 2023, GoodRx found a solution. Forsaking a long tradition of competition for patients between PBMs and discount card programs, GoodRx created an "Integrated Savings Program," and partnered up with the PBM Defendants to incorporate GoodRx's discounts into the PBMs' pharmacy benefits.

68.    During an earnings call on November 8, 2022, GoodRx announced the first Integrated Savings Program collaboration with Express Scripts to commence in early 2023. Under a new program, which Express Scripts called Price Assure, eligible Express Scripts group members would automatically access GoodRx prices for generic drugs as part of their pharmacy benefit. Through this collaboration, GoodRx boasted, the company could gain access to many new users—and charge new fees— and Express Scripts could keep collecting fees from members who might otherwise resort to GoodRx because the program "keeps visibility of the eligible members['] GoodRx claims within the pharmacy benefit." The program launched in or around February 2023.

69.    On July 12, 2023, CVS Health announced a second Integrated Savings Program partnership with GoodRx of its own. CVS called it the "Caremark® Cost Saver™" program. According to the press release, as of January 1, 2024, "CVS Caremark's eligible members [would] have automatic access to GoodRx's prescription pricing to allow them to pay lower prices, when available, on generic medications in a seamless experience at the pharmacy counter."[8] Under this program, patients' out-of-pocket cost would count towards plan members' deductible and out-of-pocket maximums. No longer would patients have to choose between the prices

---

[8] CVS Health Press Release, *CVS Caremark and GoodRx to launch Caremark® Cost Saver™ to help lower out-of-pocket drug costs for CVS Caremark clients' members* (July 12, 2023).

1    offered by two competitors: Caremark and GoodRx. Instead, as Scott Wagner, Interim

2    CEO of GoodRx put it:

> 3    Through this program, patients don't have to choose
> 4    between using their pharmacy benefit or using GoodRx to
> 5    save on their prescriptions—now they can do both right at
> 6    the counter so they have confidence they are always paying
> 7    the lowest available price.

8    70.    On September 13, 2023, GoodRx and MedImpact announced their

9    partnership starting January 1, 2024. MedImpact would integrate GoodRx's platform

10    into its pharmacy benefit, so that when a MedImpact member filled a generic

11    prescription at the pharmacy counter, the member would automatically benefit from

12    GoodRx's prices, if they were lower than the prices MedImpact otherwise offered.

13    The patient's cost-sharing obligations would count towards their deductible.[9] In the

14    press release announcing the GoodRx-MedImpact partnership, GoodRx boasted that

15    this "program" now "reach[ed] over 60% of insured lives."[10]

16    71.    On October 12, 2023, GoodRx and Navitus announced that they, too,

17    would team up to provide Navitus' members with "automatic access to GoodRx prices

18    on generic drugs in a seamless experience at the pharmacy counter." They called the

19    program the "Savings Connect" Program in January of 2024.[11] Once again, GoodRx

20    made clear that two former competitors had decided to collude, rather than compete.

21    Under the program:

22

23    ───────────────

24    [9] GoodRx Press Release, *GoodRx and MedImpact Announce Program to Ensure Seamless Access to Affordable Prescriptions* (Sept. 13, 2023).

25    [10] *Id.*

26    [11] GoodRx Press Release, *GoodRx and Navitus Health Solutions Announce Savings

27    Connect Program to Deliver Lower Prescription Prices for Navitus Members* (Oct.

28    12, 2023).

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

> Consumers no longer have to . . . choose between using their
> insurance or a discounted price available through GoodRx.
> Both prices are compared behind the scenes and the lowest
> one is delivered directly to the consumer.[12]

72.     These press releases from GoodRx and the PBM Defendants reveal the core contours of their scheme. First, GoodRx and the PBM Defendants agreed to share confidential data and information: the prices at which the PBMs offered a prescription medication and the lowest price accessed by GoodRx. Second, they agreed to integrate their operations. And third, they agreed to eliminate customer choice by collaborating rather than competing.

73.     While the PBM Defendants dressed this collaboration with GoodRx up in different names—Price Assure, Cost Saver, Savings Connect—GoodRx has acknowledged it is all one initiative: GoodRx's Integrated Savings Program. All PBM Defendants agreed with GoodRx to engage in the same conduct: to share confidential reimbursement data with GoodRx; to benefit from the prices negotiated by competitors; and to collude, rather than compete. This agreement is referred to in this complaint as the "GoodRx Integrated Savings Program cartel."

74.     The GoodRx Integrated Savings Program cartel is comprised of GoodRx and the four PBM Defendants who have integrated GoodRx's algorithm into their processes for reimbursing insured prescription claims. It does not include supplying PBMs that supply their prices to GoodRx but have not incorporated GoodRx into their claims processing.

/ / /

/ / /

/ / /

/ / /

---

[12] *Id.*

1024833.1

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

3.      **The GoodRx Integrated Savings Program Cartel Works Together to Collectively Suppress Payments to Independent Pharmacies.**

75.     The GoodRx Integrated Savings Program cartel forces small independent pharmacies to pay additional fees and artificially reduces their compensation for prescription drugs.

76.     First, the main purpose and effect of the GoodRx Integrated Savings Program cartel is to pay pharmacies less for prescriptions they dispense. Each time an insured whose health plan has contracted with one of the PBM Defendants presents a prescription and their insurance card to a pharmacist, the PBM searches for the lowest possible price paid to the pharmacy by *any* PBM. For a real-world example, Caremark contracted with a small pharmacy in Minnesota called Hopkins Drug Center. When a Caremark member presented their insurance card at Hopkins to pay for a prescription of 56 tablets of the antibiotic doxycycline 100 mg, Caremark searched GoodRx's pricing data and discovered that another PBM, called CerPassRx, had a negotiated rate of $14.32 for that prescription at that pharmacy, which was lower than Caremark's negotiated price (and lower than the fair payment price of $19.02). Facilitated by the GoodRx Integrated Savings Program cartel, Caremark paid CerPassRx's price, rather than the (higher) price it had negotiated with Hopkins.

77.     Second, the GoodRx Integrated Savings Program cartel inserts a second PBM into the flow of money in the prescription drug supply chain and enriches a patient's PBM each time a prescription is filled, even if that PBM had nothing to do with the prescription being filled.

78.     In an ordinary pharmacy transaction using the GoodRx discount program, a patient must choose to use either GoodRx or their insurance; they cannot use both. When they opt to use GoodRx, as described above, GoodRx utilizes the lowest price negotiated by one of the dozen PBMs it has partnered with. That supplying PBM collects a fee from the filling pharmacy, and it shares a portion of that

fee with GoodRx. But the patient's PBM collects nothing, because it has nothing to do with the transaction: the patient opted to exclude it.

79.    But within the GoodRx Integrated Savings Program cartel, the patient does not choose between using GoodRx or their insurance: whenever they present their insurance card with their PBM's name on it at the pharmacy counter, their PBM automatically scans GoodRx's pricing data to determine whether one of its dozen competitors offers a lower price. If so, the patient's PBM then directs the pharmacy to use that competitor PBM's reimbursement price. When this happens *both* the PBM that negotiated the price (PBM #1 in the diagram below) *and* the patient's PBM (PBM #2) collect fees from the pharmacy:



80.    This causes small independent pharmacies to pay additional fees. GoodRx does not reduce the fee it collects or share a portion of its fee with the patient's PBM; it collects the same fee regardless of whether its services are accessed through its regular discount card program or through the GoodRx Integrated Savings Program. Thus, in addition to collecting fees on prescriptions filled by patients that visit GoodRx's website or use GoodRx's app to present a coupon at the pharmacy

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

counter, it also collects fees every time a GoodRx-supplied price is algorithmically selected and used by one of the PBM Defendants. And, upon information and belief, the PBM that supplied the negotiated rate (PBM #1 in the above diagram)—a PBM that, many times, is not a member of the GoodRx Integrated Savings Program cartel—does not reduce its share of a fee to split that fee with a competitor.

81.    GoodRx has estimated that its Integrated Savings Program will impact an estimated 500 million to 600 million prescriptions a year as it ramps up, enabling GoodRx to collect more than an estimated $200 million from the program each year. And GoodRx expects to expand on that by bringing more PBMs into the conspiracy over time, and to convince the PBM Defendants to apply the cartel's activities to additional payors that have contracted with those PBMs.

**B.    The Partnerships Between GoodRx and the PBM Defendants Constitutes an antitrust cartel.**

**1.    There is Direct Evidence of a Conspiracy to Suppress the Prices of Pharmacy Dispensing Services, and Not to Compete.**

82.    There is direct evidence that members of the GoodRx Integrated Savings Program cartel have agreed to suppress reimbursements to independent pharmacies in GoodRx-related transactions. The direct evidence includes: (i) the agreements between GoodRx and the PBM Defendants, and (ii) public statements and communications by GoodRx and PBM Defendants admitting to the existence of these contracts.

**(i)    GoodRx and the PBM Defendants Agreed Not to Compete**.

83.    Each of the PBM Defendants that has joined the GoodRx Integrated Savings Program cartel agreed to share pricing data with GoodRx in real time; to utilize competing PBMs' reimbursement prices if those prices were lower than their

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

own; to allow GoodRx to set the price of any prescription reimbursement; to split the savings generated by this scheme with GoodRx; and not to compete with GoodRx.

84.     Under the agreements, each time a PBM Defendant's member presents a prescription along with their insurance card at the pharmacy counter, that PBM Defendant accesses GoodRx's pricing information for that prescription. GoodRx's pricing information is an aggregate of multiple PBMs' pricing information—including several PBMs that have not joined the GoodRx Integrated Savings Program cartel. Whenever one of the prices aggregated by GoodRx is lower than a PBM Defendant's price for a given prescription, the PBM Defendant has agreed to use the price supplied by GoodRx, rather than the price it itself negotiated. And when they do so, the PBM Defendants and GoodRx have agreed to both profit from the reduced price.

85.     As GoodRx has publicly explained, whenever it enters a contract with a PBM, its contract "include[s] provisions that, among others, restrict the ability of PBMs . . . to compete with us and solicit our customers." In other words, the contracts between GoodRx and each PBM Defendant include an express agreement not to compete. Members of the GoodRx cartel have all agreed—and know, thanks to GoodRx's public statements, that the others have agreed—not to try to draw patients away from each other.

### (ii)     Public Statements by GoodRx and the PBM Defendants Confirm They Agreed Not to Compete

86.     GoodRx, Caremark, Express Scripts, MedImpact, and Navitus have all issued press releases confirming that they have entered into agreements to integrate GoodRx into the PBM's processes.[13] Each press release confirms the existence of an

---

[13] *See* Community Health Options Press Release, *Express Scripts Pharmacy Benefit Offers Members Seamless Savings with GoodRx* (Mar. 16, 2023); CVS Health Press Release, *CVS Caremark and GoodRx to launch Caremark® Cost Saver$^{TM}$ to help lower out-of-pocket drug costs for CVS Caremark clients' members* (July 12, 2023);

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  agreement and the core contours of the GoodRx Integrated Savings Program cartel:

2  an agreement to share data, and to fix the reimbursement rates paid to pharmacies at

3  the lowest available price for all GoodRx-related transactions.

4      87.    GoodRx's public statements to its investors also confirm the existence

5  of the agreement. For example, in a 2024 Investor Day presentation, GoodRx boasted

6  that its "integrated savings program embeds GoodRx directly into the member's

7  funded benefit plan," and guarantees that pharmacies will be paid the "[l]esser of

8  insurance price and GoodRx price for eligible medications."

9      88.    CVS Health—the parent company of Caremark—has also made public

10 statements confirming the existence of the cartel. In its recent *Healthy 2030 2023*

11 *Impact Report*, CVS Health reported:

12         Through a new collaboration with GoodRx$^{TM}$, Caremark

13         Cost Saver$^{TM}$ is helping members pay lower prices on

14         generic medications when available. The tool lets us

15         compare the GoodRx available drug discount price to the

16         member's out-of-pocket cost at the pharmacy counter in

17         real time.

18 **2.    There is Also Circumstantial Evidence of the**

19 **Conspiracy.**

20     89.    Defendants' parallel conduct is circumstantial evidence that the cartel

21 exists.

22     90.    GoodRx and the PBM Defendants engaged in parallel conduct: they

23 suppressed the amount paid and increased the fees charged to independent

24 pharmacists for filling prescriptions for the PBM Defendants' insured members.

25 _____

26 GoodRx Press Release, *GoodRx and MedImpact Announce Program to Ensure*
*Seamless Access to Affordable Prescriptions* (Sept. 13, 2023); GoodRx Press Release,
27 *GoodRx and Navitus Health Solutions Announce Savings Connect Program to*
*Deliver Lower Prescription Prices for Navitus Members* (Oct. 12, 2023).
28

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

91.     GoodRx also facilitated a transition away from a marketplace in which the PBM Defendants competed with one another to negotiate reimbursement agreements with independent pharmacies and to a coordinated regime. Under this regime, the PBM Defendants no longer negotiate to secure a competitive reimbursement rate; instead, they just adopt and use the lowest rate negotiated by any competitor, then split their savings with GoodRx. This shift represents a sudden departure from the way the PBM industry has operated for years.

92.     Since GoodRx's founding in 2011, GoodRx and PBMs have competed head-to-head to reimburse pharmacies for prescriptions at the pharmacy counter. If an insured patient chose to use their insured prescription benefit, then their designated PBM adjudicated the prescription drug claim, and the pharmacy paid the PBM for doing so. If that patient opted to use GoodRx instead, then the pharmacy paid a fee to GoodRx, which GoodRx shared with the PBM that supplied the reimbursement rate used by the patient, and the patient's designated PBM collected none. But under the GoodRx Integrated Savings Program cartel, the PBM Defendants automatically divert prescription drug claims to GoodRx, which returns the lowest rate; the patient's PBM *and* GoodRx *and* the supplying PBM collect fees from the pharmacy. As a result, pharmacists must, suddenly, pay more fees, and fees to more entities, for many of the prescription drug claims adjudicated through the PBM Defendants.

93.     Furthermore, pharmacists historically could choose whether to accept GoodRx's discount codes. Accepting those codes meant paying GoodRx's fees. For all pharmacists, these fees strain their already paltry margins. The average GoodRx fee is approximately $5. When a pharmacy's margins on a prescription drug claim are already mere pennies, at best, accepting GoodRx and its additional fees could mean the difference between making $0.03 for dispensing a prescription and losing money on the prescription, or between losing money on a prescription and losing even *more* money on a prescription. For that reason, some small, independent pharmacies have historically opted *not* to accept GoodRx coupons. Under the GoodRx Integrated Price

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  Savings Program cartel, however, the PBM Defendants and GoodRx have decided to

2  take that choice away from pharmacists. Now, any pharmacist that is in-network with

3  one of the PBM Defendants (and being in network with large PBMs like the PBM

4  Defendants is necessary for virtually all independent pharmacies) has no choice but

5  to pay GoodRx's fees whenever a PBM Defendant invokes a GoodRx price instead

6  of its own.

7       94.    The GoodRx Integrated Savings Program cartel's structure also

8  generates parallel reimbursements to pharmacists. Previously, a prescription claim

9  adjudicated by Caremark would be reimbursed according to Caremark's negotiated

10 rates; a prescription claim adjudicated by Express Scripts would be reimbursed

11 according to Express Scripts' negotiated rates; a prescription claim adjudicated by

12 MedImpact would be adjudicated according to MedImpact's negotiated

13 reimbursement rates; and so on. Now, regardless of whether the prescription claim is

14 adjudicated by Caremark, Express Scripts, MedImpact, or Navitus, the claim is

15 adjudicated according to the same exact rate: the lowest rate secured by one of any

16 dozens of PBMs. Defendants' agreement, therefore, standardizes prescription drug

17 reimbursements at the lowest possible rate.

18      95.    In a competitive market, competing PBMs would not agree to use a

19 common tool provided by a competitor to suppress prescription drug reimbursement

20 claims. Among other things, by paying reasonable reimbursement rates, PBMs could

21 be certain that pharmacists would continue to serve patients tied to their services.

22      96.    Even if the PBM Defendants' only incentive were to pay the lowest

23 available rate for prescription drug claims, in a competitive market, they would not

24 agree to do so using the same program offered by the same provider (i.e., GoodRx's

25 Integrated Savings Program), which also happens to be a rival in the prescription drug

26 claim reimbursement market. Rather, they would compete to find the optimal balance

27 between keeping the costs of claims down while also minimizing the risk that

28 pharmacies would refuse to do business with them. Absent a conspiracy, the PBM

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Defendants would negotiate their own reimbursement rates that accurately reflected their size, bargaining power, and business strategies. Now, instead, they just borrow the rate negotiated by a competitor. That rate—agreed to by the competitor PBM and a participating pharmacy—reflects that pharmacy's judgment about what reimbursement rate it can accept, considering the volume of patients subject to that rate, the fees that particular PBM would charge, and other factors that are unique to that PBM.

97.     By implementing the exact same reimbursement suppression strategies, the PBM Defendants can collectively maximize their profit while still charging their fees (regardless of whether they are comparable to their competitors' fees), and split their ill-gotten gains with GoodRx, which would otherwise not profit from reimbursement claims adjudicated under the PBMs' pharmacy benefits. The only market players who lose are the pharmacies, who have no choice but to accept suppressed payments and pay inflated fees.

### 3.     Several "Plus Factors" Support Plaintiff's Allegations of a Conspiracy.

98.     Plus factors are categories of evidence that help courts and juries differentiate competition and collusion. Here, multiple plus factors support the existence of the GoodRx Integrated Savings Program cartel, including: (i) GoodRx's and the PBM Defendants' motives to conspire; (ii) the PBM Defendants' utilization of real-time competitor pricing information to determine reimbursements; (iii) the cartel's artificial standardization of market rates; (iv) the high levels of concentration within the prescription drug claim reimbursement market; and (v) the prescription drug claim reimbursement market's high barriers to entry.

/ / /

/ / /

/ / /

/ / /

1

2

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(i)   **GoodRx and the PBM Defendants Have Motives to Conspire.**

99.   GoodRx and the PBM Defendants had distinct, complementary motives to conspire—the ultimate aim of which, for all involved, was additional revenue at the expense of pharmacies.

100.   GoodRx's motive was to gain back and increase the volume of fees it had lost when its partnership with Kroger dissolved. GoodRx could not control the prescription prices it offered through its platform—those were determined by agreements between PBMs and pharmacies. Therefore, it could not slash its prices to lure additional patients to choose GoodRx over their insurance at the pharmacy counter. The number of monthly active patients that elected to visit GoodRx's platform had remained relatively stable (fluctuating between 5.7 million and 6.4 million) since the end of 2020 when healthcare access normalized following the emergence of the Covid-19 pandemic. So there was not an organic source of new patients visiting GoodRx's platform.

101.   The PBM Defendants, meanwhile, had their own motive to conspire with GoodRx and with each other.  Each time a patient chose to forsake their insured pharmacy benefit and utilize GoodRx's discounts, the PBMs lost out on opportunities to collect fees and other payouts from pharmacies, manufacturers, and health plans. To staunch this shift, PBMs would have to compete more effectively with GoodRx by restoring some of the value of a prescription drug benefit to patients; but doing so would cut into their lucrative margins. By colluding with GoodRx, rather than competing, the PBM Defendants could continue to shift costs onto pharmacies, and still collect fees on the transactions. In short, the PBM Defendants could make additional money by colluding that they could not if they continued to compete.

/ / /

/ / /

/ / /

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1
2

          (ii)     **The GoodRx Cartel Gives the PBM Defendants Real-Time Access to competitors' Pricing Information.**

3
4
5
6
7
8

    102.   GoodRx has, by virtue of its discount card aggregation business, access to more than a dozen PBMs' prescription drug pricing information. This is highly specific, highly granulated data which varies drug by drug and pharmacy by pharmacy. It aggregates that information and, when a patient seeks to use GoodRx's discount at the pharmacy counter, it provides to the pharmacy the BIN and PCN codes necessary to route the prescription to the correct PBM.

9
10
11
12
13
14
15
16

    103.   Within the GoodRx Integrated Savings Program cartel, *all* of GoodRx's data, including which PBMs are offering which discounts, is integrated into the PBM Defendants' claims processing systems. When an insured patient presents their prescription benefit card at the pharmacy, the pharmacist sends the claim to the patient's PBM. That means that the PBM Defendants are searching through the offers from their competitor PBMs, selecting the competitor PBM that negotiated the lowest price, and then instructing the pharmacy on which PBM to use by transmitting the competitors' identification codes.

17
18
19
20
21
22

    104.   By using the GoodRx Integrated Savings Program, the PBM Defendants gain invaluable information about their competitors' deals with pharmacies: they not only know when someone has negotiated a lower price than they have, they know who negotiated it. This price-sharing practice is particularly aberrant among PBMs, who are typically "fanatical about the secrecy of their pricing," and thus strong circumstantial evidence of a conspiracy.

23
24
25
26

    105.   Not only does GoodRx share its pricing data—which is really the pricing data of other PBM competitors—with the PBM Defendants, its competitors; this data sharing is pervasive, occurring each time a patient insured by one of the PBM Defendants accesses their prescription drug benefit.

27
28

    106.   Approximately 6.3 billion prescriptions are filled every year. The PBM Defendants collectively account for close to two-thirds of all prescription drug

claims—or 4.1 billion to 4.4 billion prescription claims each year. That means that GoodRx and the PBM Defendants are sharing pricing data more than 11 million times *every day*.

### (iii)    The GoodRx Integrated Savings Program Cartel Artificially Standardizes Market Rates for Prescription Drug Claims.

107.    The result of the GoodRx Integrated Savings Program cartel—indeed, its goal—is the artificial standardization of the prices paid to pharmacies for prescription drug claims.

108.    In a competitive market, each PBM would negotiate to secure its own reimbursement rate agreements with independent pharmacies. The PBMs would seek to differentiate themselves from competitors based on the number of covered patients they can offer the pharmacy access to, the reimbursements offered, and the fees attached to the agreement. PBMs would seek the lowest possible cost for pharmacists' services. Pharmacists would push back to secure a more lucrative deal. This competition would result in competitive rates for independent pharmacists' services.

109.    But the GoodRx Integrated Savings Program cartel eliminates all motivation for the PBM Defendants to compete. Caremark, Express Scripts, MedImpact, and Navitus no longer need to seek to negotiate the lowest possible price, and their efforts to secure a lower price cannot be constrained by pharmacy pushback. Instead, the PBM Defendants automatically choose the lowest available price offered to a pharmacy by *any* PBM in every GoodRx-related transaction.

110.    The cartel also results in the standardization and inflation of fees charged to pharmacists in every GoodRx-related transaction. Before the GoodRx Integrated Savings Program cartel formed, pharmacists had to pay fees to only one PBM per transaction, and they had to pay GoodRx's 15% fee only when an insured patient opted to use GoodRx instead of their insurance benefits. But under the GoodRx Integrated Savings Program cartel, Defendants force pharmacists to pay fees to two

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  PBMs (a PBM Defendant and the PBM that supplied the price paid). Now, Defendants

2  force pharmacies to pay GoodRx's fee on each of the billions of prescriptions

3  adjudicated using a price supplied by GoodRx.

4     111.  Since the PBM Defendants control close to two-thirds of all prescription

5  claims adjudicated, pharmacists receive the lowest possible reimbursement, and pay

6  additional fees, for close to two-thirds of all prescriptions filled. This largely

7  standardizes the prices paid to, and fees extracted from, independent pharmacies

8  across the entire prescription drug claim reimbursement market.

9           **(iv)   The Prescription Drug Claim Reimbursement Market**

10                   **is Highly Concentrated.**

11     112.  Collusion has a greater chance of success, and therefore is more likely,

12  in highly concentrated markets. PBMs and GoodRx operate in a highly concentrated

13  space in the U.S. pharmaceutical distribution chain.

14     113.  The U.S. Department of Justice and the Federal Trade Commission

15  evaluate the consolidation of a market—most commonly in the context of assessing

16  proposed mergers—using the Herfindahl-Hirschman Index ("HHI"), which is

17  calculated by squaring the market share of each competitor in a market.[14] A highly

18  commoditized market with many participants would have an HHI near zero;

19  conversely, a market with only one participant holding 100% of the market would

20  have an HHI of 10,000.[15] The DOJ and FTC consider a market with an HHI of over

21  1,000 to 1,800 to be moderately concentrated, and a market with an HHI of over 1,800

22  to be "highly concentrated", and presumes that a change in HHI from a combination

23

24

25

26  _____

27  [14] U.S. DOJ & FTC, *Merger Guidelines* 5 (Dec. 18, 2023).

28  [15] *Id.*

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

among market participants of over 100 will substantially lessen competition in that market.[16]

114.    First, GoodRx holds a commanding plurality of the discount card market: it controls 44% of all discount card transactions. Its next closest competitor accounts for just 14% of transactions, with its second and third largest competitors accounting for 8% and 7%, respectively. The remaining 26% of the market is shared among all other, smaller, discount card companies. This means that the market for discount card services is highly concentrated, with an HHI above 2,196.

115.    Second, the market for prescription drug claim reimbursements from PBMs is highly concentrated. The three largest PBMs control 80% of the total prescriptions filled through insurance; the top 5 control 94%.[17] The HHI of the market for total prescription claims, at the national level, is at least 2,252.

116.    This national-level market share, though, does not tell the whole story. While most PBMs operate on a nationwide scale, their presence is not uniform across the whole country; some have higher market shares in one area than another. At the state level, the average HHI for PBMs is 3,703, with 84% of states' markets qualifying as highly concentrated. At the local level, defined as the Metropolitan Statistical Area ("MSA") the average HHI is even higher: 4,086, with 85% of MSAs qualifying as highly concentrated.[18]

/ / /

---

[16] *Id.* at 5-6.

[17] Caremark leads the pack with 34% of total equivalent prescription claims managed in 2023, followed by Express Scripts at 23%, OptumRx at 22%, Humana Pharmacy Solutions at 7%, MedImpact at 5%, and Prime Therapeutics at 3%. All other PBMs, plus cash paying customers, make up only 6% of the total prescription claims.

[18] In some regions of the country, concentration levels were even higher still: for example, in Alabama, the HHI is 7,284; in Michigan it is 6,622; and in Delaware it is 6,471. In only one state, Georgia, was the HHI of the PBM markets lower than 1,800.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

117.   Furthermore, through their association and utilization of insurance and pharmacy networks, pharmacies have little choice but to utilize the services and benefits offered by PBMs. The top 10 PBMs control 97% of the market for retail pharmacy network management—meaning those 10 PBMs control which pharmacies 97 out of 100 people in the United States can use. Under this metric, Express Scripts leads the pack at the national level with 22%; followed by OptumRx at 18%; Caremark at 16%; Prime at 14%; and others at 11%, 10%, 3%, 2%, 1%, 1%, and 1% to round out the top ten. The HHI for the market for access to PBMs' network pharmacies is at least 1,495, which qualifies as moderately concentrated.

118.   And although no industry analyst appears to have analyzed the market share of PBMs in terms of covered lives, using only the percentages of covered lives controlled by the five PBM Defendants in this case, it is clear the market is highly concentrated. The PBM Defendants' share of covered lives yields an HHI of at least 2,113, and the actual HHI is likely much higher, considering that OptumRx, which is not one of the PBM Defendants, is one of the three largest PBMs and vertically integrated with the largest insurer, UnitedHealth, and thus commands significant market share on its own. As a function of access to covered lives, the prescription drug claim reimbursement market is, once again, highly concentrated.

### (v)    There are High Barriers to Entry.

119.   There are high barriers to entry in the U.S. prescription drug claim reimbursement market.

120.   Gaining a foothold poses formidable challenges to would-be market entrants. PBMs are responsible for much more than just adjudicating prescription drug claims. To function they must also convince health plans to contract for their services, negotiate rebates and fees for thousands of drugs with drug companies, build a robust pharmacy network by negotiating contracts with tens of thousands of pharmacies, develop the requisite expertise to fulfill the scientific scrutiny role of a Pharmacy and Therapeutics committee, develop and maintain a formulary, and many other tasks.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

121.   Even if a potential competitor opted to forge ahead despite these barriers, it would require significant capital outlays to operate as a PBM. And they would face significant hurdles contending with the economies of scale enjoyed by their incumbent competitors. This dynamic presents aspiring PBM entrants with a chicken-and-egg type of conundrum: to be able to negotiate favorable drug rebates or build a pharmacy network with competitive reimbursement prices, an aspiring entrant would need to amass a large number of insured members; but to convince insurers to abandon their existing PBM and retain this new PBM, the PBM would have to have competitive drug pricing and pharmacy reimbursement rates, along with a robust pharmacy network.

122.   Establishing name recognition in an industry dominated by long-entrenched, well-recognized, and vertically integrated incumbents presents an additional significant hurdle. Furthermore, many PBMs—such as Caremark and Express Scripts—are vertically integrated with insurers representing large swaths of the insured population that the new entrant could not hope to pry away. And many incumbents—like Caremark and Navitus—are vertically integrated with pharmacies which would be unlikely to give a favorable deal to their integrated incumbent PBM's new competitor.

123.   The provision of prescription benefits, as a subset of health benefits, is also highly regulated at both the federal and state level. And state laws governing PBM businesses specifically vary from state to state. Every state has laws directed to PBMs. Over half of the states require PBM licensure or registration. Nearly half require reporting rebate or other information to the state. Some states have outlawed spread pricing, for example, while some prohibit clawbacks or retroactive fees. On top of that, both the U.S. Congress and the FTC have been scrutinizing PBM business models, with changes likely on the horizon. This patchwork is ever-changing as new legal and regulatory requirements are created on a regular basis.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

124.   These barriers to entry further cement the industry dominance of the PBM Defendants—five of the six largest PBMs in the country—by ensuring a new market entrant cannot upset the GoodRx Integrated Savings Program cartel's scheme.

**C.    The GoodRx Cartel Harms Pharmacies By Suppressing Reimbursements, Ballooning the Fees They Pay PBMs, and Depriving Them of Pricing Guarantees.**

125.   GoodRx and the PBM Defendants profit handsomely from the GoodRx Integrated Savings Program cartel, at the expense of independent pharmacies.

126.   First, the cartel's scheme empowers GoodRx to collect fees on more prescription claims than it could under its original design. From its inception and until the formation of the cartel, GoodRx could collect fees only when a patient used GoodRx's discount codes, which necessarily meant *not* using their pharmacy benefit.

127.   But now, GoodRx's prices are automatically applied whenever they are lower than a PBM Defendant's, so GoodRx can now collect a fee on prescription drug claims processed through patients' prescription benefits. GoodRx predicts that 5% of the claims processed thus far in 2024 using its aggregated pricing data are attributable to Defendants' integrated savings program. With more than 100 million paid claims per year, and with an average fee of $5 per transaction, that amounts to more than a projected $25 million per year in additional fees extracted from pharmacies by GoodRx.

128.   Second, the GoodRx Integrated Savings Program cartel's scheme empowers the PBM Defendants to artificially suppress the reimbursements they pay to pharmacies. PBMs profit from lower reimbursements to and from extracting larger fees from health plans: the larger the savings, the larger the fee. Once again, suppressing the reimbursement rates paid to pharmacies represents greater profits to the PBM Defendants. And on top of that, the PBM Defendants can charge the pharmacies fees, and claw back payments to pharmacies, on prescriptions that, prior to the cartel's formation, they could not.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

129.   Because the PBM Defendants keep their negotiated drug prices and prescription dispensing fees secret (except from their co-conspirators in the GoodRx Integrated Savings Program cartel), the precise amount of excess money they collect from pharmacies cannot be calculated without discovery. But assuming that using GoodRx's algorithm to price their prescription drug reimbursements results in a GoodRx price being used 5% of the time, assuming that the GoodRx price is, on average, $5 less than the PBM's negotiated reimbursement price; and assuming that the average PBM dispensing fee is just $2, the PBM Defendants could expect to underpay pharmacies by approximately $35 million from the GoodRx Integrated Savings Program cartel in 2024 alone.

130.   Third, the GoodRx Integrated Savings Program cartel deprives independent pharmacies of the benefit of contractual price guarantees. A common term in a network pharmacy contract between a PBM and an independent pharmacy is an "effective rate" guarantee. In the pharmacy context, an effective rate guarantee clause is a promise from a PBM to a pharmacy that the PBM will assure a minimum level of aggregate reimbursement to a pharmacy (usually expressed as a percentage of a benchmark price, such as "AWP – 85%"). PBMs and pharmacies periodically true up the reimbursement payments from PBMs to pharmacies, which often results in PBMs remitting thousands of dollars they owe to pharmacies to meet the minimum guaranteed reimbursement level.

131.   However, these pharmacy effective rate guarantees contractually do not apply to any prescription claims adjudicated through discount card programs like GoodRx—meaning that the PBM Defendants can evade their minimum payment obligations to independent pharmacies whenever claims are processed using a reimbursement rate supplied by GoodRx. Upon information and belief, the prescription claims shunted through the GoodRx Integrated Savings Program cartel's payment suppressing scheme disproportionately represent claims that, if processed through ordinary reimbursement mechanisms, would have required the PBM

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   Defendants to provide additional payments to independent pharmacies. As a result,

2   pharmacies lose out on thousands of dollars a month. Upon information and belief,

3   these losses are steep, and can be equal to, or as much as double, the losses

4   independent pharmacies sustain from the additional GoodRx fees and depressed

5   reimbursement rates.

6       132.   The damages resulting from the GoodRx Integrated Savings Program

7   cartel will only grow as time goes on. Unless enjoined, the cartel will likely continue

8   to grow and add new members, and an increased number of prescriptions will be

9   processed through the cartel. The GoodRx Integrated Savings Program cartel removes

10  the PBM Defendants' need and incentive to negotiate aggressively for lower

11  pharmacy reimbursement rates. Why negotiate to beat competitors when you can just

12  algorithmically adopt your competitor's hard-negotiated reimbursement price?

13              **VI.  ANTITRUST IMPACT**

14      133.   During the relevant time period, Plaintiff's members and Class Members

15  purchased substantial reimbursements for prescription drug claims directly from

16  Defendants.

17      134.   As a result of Defendants' illegal conduct, Plaintiff's members and Class

18  Members paid artificially inflated prices to the PBM Defendants and GoodRx in order

19  to secure access to reimbursements for claims for prescription drugs dispensed to the

20  PBM Defendants' insureds. Those prices were substantially greater than the prices

21  Plaintiff's members and Class Members would have paid but for the illegal conduct

22  alleged herein because: (1) the discounts that pharmacies had to concede to secure

23  prescription drug claim reimbursements were artificially inflated by Defendants'

24  illegal conduct; (2) the fees pharmacies had to pay to secure prescription drug claim

25  reimbursements were multiplied by Defendants' illegal conduct; and (3) pharmacies

26  were deprived of the opportunity to refuse to accept GoodRx's aggregated discounts.

27  / / /

28  / / /

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

135. As a consequence, Plaintiff's members and Class Members have sustained substantial losses and damage to their business and property in the form of overcharges.

## VII. <u>IMPACT ON INTERSTATE COMMERCE</u>

136. At all relevant times, Defendants offered, adjudicated, and disbursed reimbursements for prescription drug claims in a continuous and uninterrupted flow of commerce across state and national line and throughout the United States.

137. At all material times, Defendants transmitted and received funds, contracts, invoices, and other forms of business communications and transactions, through the mail and over the wires in a continuous and uninterrupted flow of commerce across state and national lines and throughout the United States in connection with the adjudication of prescription drug reimbursements by members of the GoodRx Integrated Savings Program cartel through GoodRx's Integrated Savings Program.

138. In furtherance of their efforts to restrain competition, Defendants employed the U.S. mail and interstate and international telephone lines, as well as means of interstate and international travel. Defendants' activities were within the flow of, and have substantially affected (and will continue to substantially affect), interstate commerce.

## VIII. <u>CLASS ALLEGATIONS</u>

139. Plaintiff brings this action on behalf of itself and, under Federal Rule of Civil Procedure 23(a) and (b)(2), as a representative of the following Class defined as:

> All entities within the United States who currently dispense generic prescription medication to patients using insurance from one of the PBM Defendants for that prescription at a GoodRx-supplied price.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Excluded from the Class are Defendants and any entities owned or operated by Defendants and/or their officers, directors, management, employees, parents, subsidiaries, or affiliates, and all governmental entities. For the avoidance of doubt, any pharmacies that are part of the same vertically integrated entity as any Defendant are excluded from the Class.

140.    Class Members are so numerous that joinder is impracticable. There are nearly 20,000 independent pharmacies in the United States.

141.    Plaintiff's claims are typical of the claims of Class Members. Plaintiff's members and Class Members were damaged by the same wrongful conduct—i.e., they will show that the same anticompetitive and unlawful misconduct informed them and caused them to receive reimbursements for dispensing prescriptions that were lower than what they would have received absent Defendants' wrongful and collusive conduct.

142.    Plaintiff is represented by counsel with experience in the prosecution of class action antitrust litigation, with particular experience with class action antitrust litigation involving the healthcare industry. Plaintiff's counsel possesses the resources and expertise needed to vigorously litigate the case for the Class.

143.    Plaintiff will fairly and adequately protect and represent the interests of Class Members. Plaintiff's interests and those of its counsel fully align with, and are not antagonistic to, the interests of Class Members. Plaintiff will and can carry out the duties incumbent on class representatives to protect the interests of all Class Members.

144.    Questions of law and fact common to the members of the Class include:

(a)    Whether Defendants formed a horizontal agreement, combination, conspiracy, or common understanding pursuant to which they artificially suppressed the rate paid to independent pharmacies for dispensing medications to individuals whose prescription drug benefits were administered by the PBM Defendants;

(b)    Whether Defendants' alleged misconduct constitutes a *per se*

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

violation of Section 1 of the Sherman Antitrust Act;

(c)    Whether Defendants' conduct caused Class Members throughout the United States to receive artificially suppressed reimbursements for dispensing medications to individuals whose prescription drug benefits were administered by the PBM Defendants;

(d)    Whether the anticompetitive scheme alleged herein has substantially affected interstate commerce; and

(e)    Whether Defendants' anticompetitive conduct caused antitrust injury to Plaintiff and Class Members.

145.   Defendants have acted or refused to act on grounds that apply generally to the (b)(2) Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the (b)(2) Class as a whole.

146.   Plaintiff knows of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## IX.  CAUSES OF ACTION

### CLAIM I: AGREEMENT IN RESTRAINT OF TRADE

**A *per se* violation of Section 1 of the Sherman Act (15 U.S. C. § 1)**

**(Class Against All Defendants)**

147.   Plaintiff incorporates by reference all preceding paragraphs and allegations as if set forth fully herein.

148.   Plaintiff seeks injunctive relief on behalf of its members and all Class Members under Section 4 of the Clayton Antitrust Act for Defendants' conduct in violation of Section 1 of the Sherman Act.

149.   Defendants, directly and through their divisions, subsidiaries, agents, and affiliates, engage in interstate commerce in the purchase and reimbursement of prescription drug claims.

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

150.   Defendants are horizontal competitors in the market for generic prescription drug claim reimbursements. The PBM Defendants compete with one another to solicit contracts with health plans that provide the PBMs authority to reimburse for prescription drug claims by the health plans' members, and to collect revenue from pharmacies from those reimbursements. GoodRx and the PBM Defendants all compete directly with each other for individual members' prescription drug reimbursement claims.

151.   Beginning on or around January 1, 2023, Defendants entered into and engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce, which amounted to a *per se* violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1.

152.   Specifically, Defendants have combined to form a cartel to collect additional fees from independent pharmacies and artificially suppress prescription drug reimbursement rates paid to independent pharmacies across the United States in GoodRx-related transactions, which they accomplished by adopting implementing the GoodRx Integrated Savings Program.

153.   Defendants' conduct was undertaken with the intent, purpose, and effect of artificially suppressing prescription drug reimbursement rates below the competitive level and collecting fees above the competitive level in GoodRx-related transactions.

154.   Defendants perpetrated this scheme with the purpose of decreasing reimbursement rates, collecting additional fees for their own benefit, and evading the PBM Defendants' effective rate guarantee obligations to pharmacies.

155.   Defendants' conduct in furtherance of the unlawful scheme described herein was authorized, ordered, or executed by their officers, directors, agents, employees, or representatives while actively engaging in the management of the defendants' affairs.

/ / /

156.   The contract, combination, or conspiracy alleged herein has taken the form of a horizontal conspiracy between competitors in the market for pharmacy reimbursements.

157.   In furtherance of this contract, combination, or conspiracy, the Defendants have committed various acts, including as follows:

(a)   The PBM Defendants provided private, confidential, and detailed internal reimbursement data to GoodRx for use in comparing their negotiated reimbursement rates to rates aggregated by GoodRx.

(b)   GoodRx integrated its reimbursement aggregator into the PBM Defendants' claims processing infrastructure, giving the PBM Defendants real-time access to competitors' negotiated prescription drug claim reimbursement rates, as well as sufficient information to identify the competitor that had negotiated the rates.

(c)   Defendants used GoodRx's integrated data to calculate reimbursement rates for prescription drug claim reimbursement rates.

(d)   The PBM Defendants paid reimbursements for prescription drug claims according to the rates supplied by GoodRx's integrated reimbursement aggregator.

(e)   The PBM Defendants outsourced prescription drug reimbursement rates to GoodRx, knowing that GoodRx would supply an artificially suppressed price.

(f)   Defendants exchanged competitively sensitive, real-time, private, confidential, and detailed prescription drug claim reimbursement information with each other, including by using GoodRx's integrated reimbursement aggregator.

(g)   Defendants multiplied the fees charged to independent pharmacies

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    by enabling both GoodRx and a patient's PBM to collect fees
2    where, in the absence of the scheme, only one could have collected
3    a fee.

4    (h)    The PBM Defendants evaded their obligations to independent
5           pharmacies under the effective rate guarantee clauses in the PBM-
6           pharmacy contracts by migrating a significant number of
7           transactions that would otherwise be covered by that guarantee to
8           GoodRx's coupon program, which was excluded from the
9           guarantee.

10   158.   As a direct and proximate result of Defendants' unlawful cartel,
11   Plaintiff's members and Class Members have suffered injury to their business or
12   property and will continue to suffer economic injury and deprivation of the benefit of
13   free and fair competition unless the Defendants' conduct is enjoined. An award of
14   damages is insufficient to prevent this future harm, and thus, Plaintiff's members and
15   the Class Members face irreparable harm absent an order permanently enjoining
16   Defendants from continuing to operate the GoodRx Integrated Savings Program.

17   ## X.  **PETITION FOR RELIEF**

18   159.   Plaintiff petitions for the following relief:

19   (a)    A determination that this action may be maintained as a class
20          action pursuant to Federal Rule of Civil Procedure 23, that
21          Plaintiff be appointed as class representative, and that Plaintiff's
22          counsel be appointed as class counsel on behalf of the Class;

23   (b)    A determination that the conduct set forth herein is unlawful
24          under Section 1 of the Sherman Antitrust Act;

25   (c)    A permanent injunction on behalf of the Class prohibiting
26          Defendants from engaging in the anticompetitive conduct alleged
27          herein;

28   (d)    An award of attorneys' fees and costs; and

1          (e)     Such other and further relief as the Court deems just and

2               equitable.

3

DATED:  November 27, 2024     **PEARSON WARSHAW, LLP**

4

5

6

7                      By:       */s/ Daniel L. Warshaw*

8                             DANIEL L. WARSHAW

9                      Daniel L. Warshaw (Bar No. 185365)

10                    Bobby Pouya (Bar No. 245527)
                      Naveed Abaie (Bar No. 323338)

11                    **PEARSON WARSHAW, LLP**
                      15165 Ventura Boulevard, Suite 400

12                    Sherman Oaks, California 91403

13                    Telephone:  (818) 788-8300
                      Facsimile:    (818) 788-8104

14                    dwarshaw@pwfirm.com

15                    bpouya@pwfirm.com

16

17                    Heidi M. Silton (*pro hac vice* forthcoming)
                      David W. Asp (*pro hac vice* forthcoming)

18                    Joseph C. Bourne (CA Bar No. 308196)
                    **LOCKRIDGE GRINDAL NAUEN PLLP**

19                    100 Washington Avenue South, Suite 2200

20                    Minneapolis, MN 55401
                      Tel:    (612) 339-6900

21                    Fax:    (612) 339-0981

22                    hmsilton@locklaw.com
                      dwasp@locklaw.com

23                    jcbourne@locklaw.com

24

25                    *Counsel for Plaintiff and the Proposed Classes*

26

27

28

PEARSON WARSHAW, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS,, CALIFORNIA 91403